**Opinion issued June 5, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-13-01078-CV**
_____

## IN THE INTEREST OF K.C.F., M.L.M., L.M.M., AND A.G.M., MINOR CHILDREN

**On Appeal from the County Court at Law
Austin County, Texas
Trial Court Case No. 2012L-5692**

## MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between T.O.M. and his three minor daughters: nine-year-old M.L.M., seven-year-old L.M.M., and five-year-old A.G.M. The trial court also terminated the parent-child relationship between the three girls and their mother, R.J.F., who is T.O.M.'s wife. In addition, the trial court terminated the parent-

child relationship between R.J.F. and her 12-year-old son, K.C.F., who is not T.O.M.'s son.[1]

In this appeal, T.O.M. and R.J.F. each present five issues. They assert that the evidence was not legally or factually sufficient to support the trial court's findings that they had committed a predicate act necessary for termination or to support the trial court's determination that termination was in the children's best interests.

We affirm.

## Background Summary

On December 5, 2012, the Department of Family and Protective Services ("DFPS") filed suit, seeking to terminate T.O.M.'s and R.J.F.'s parental rights to their children and to obtain sole managing conservatorship if family reunification could not be achieved. DFPS offered the affidavit of caseworker Cappreese Crawley to support its petition.

Crawley testified in her affidavit that, on October 30, 2011, DFPS had received a report of "neglectful supervision" of K.C.F. (age 11), M.L.M. (age 8), L.M.M. (age 6), and A.G.M. (age 4). Crawley stated that Child Protective Services had received a call on October 29, 2011, reporting that the children's mother, R.J.F., used cocaine on a daily basis and was not properly caring for the children.

---

[1] The evidence at trial showed that K.D.F.'s father died before he was born. T.O.M. and R.J.F. married when K.C.F. was a baby.

2

The report had stated that R.J.F. would sleep for extended periods after using drugs, leaving the children unsupervised. It was also reported that R.J.F. had purchased drugs with her children present.

Crawley stated that R.J.F. had agreed to submit to drug testing during DFPS's investigation. The results were positive for opiates and amphetamines. Thus, according to Crawley, "neglectful supervision was validated." In June 2012, R.J.F. and the children's father, T.O.M., agreed to DFPS's recommended services, which included attending a parenting education program, a substance abuse assessment, and participating in random drug testing.

Crawley also testified that R.J.F. and the children lived with R.J.F.'s mother during DFPS's investigation of the reported neglect. While residing there, R.J.F. had "exhibited unstable behaviors." She had "left home for days at a time without letting anyone know her whereabouts," "taken her mother's car without permission leaving her mother and her children without transportation in case of an emergency," and "exhibited aggressive tendencies toward family members." Crawley stated that "[t]he children have reported that they have witnessed their mother take something that makes her act funny."

The affidavit indicated that the children's father, T.O.M., was incarcerated in September 2012. He had previously been incarcerated and released for different

3

offenses. Crawley stated that, in October 2012, R.J.F. tested positive for cocaine and hydrocodone.

Crawley testified that there was concern R.J.F. would leave and take the children with her. This raised concern for the children's safety.

The affidavit listed four other "cases" that the family had in the past with Child Protective Services, beginning in 2005 with allegations of "neglectful supervision." The affidavit indicated that the neglectful supervision in those cases had either been "ruled out" or the "risk factors" had been "controlled."

The affidavit also set out T.O.M.'s criminal history. This showed that, since 1990, T.O.M. had been convicted of numerous criminal offenses, including forgery, burglary of a habitation, and possession of a controlled substance.

Crawley concluded her affidavit by testifying that, on December 4, 2012, DFPS had "made the decision to take custody of [the children] due to [R.J.F.'s] substance abuse and inability to properly supervise and provide for her children." Crawley averred, that "[a]ll reasonable efforts, consistent with the time and circumstances, have been made by [the DFPS] to prevent or eliminate the need for removal of the children, but continuation in the home would be contrary to the children's welfare and not in their best interest."

On December 5, 2012, the trial court signed an emergency order for the protection of the children, finding that there existed a continuing danger to their

physical health and safety. The trial court appointed DFPS as the temporary managing conservator of the children. R.J.F.'s son, K.C.F., continued to live with R.J.F.'s mother, Donna, with whom K.C.F. had lived since he was an infant. DFPS placed R.J.F.'s and T.O.M.'s three daughters, M.L.M., L.M.M., and A.G.M. with their paternal aunt, Sherry.

DFPS also developed a family service plan for R.J.F. to follow. R.J.F. signed the family service plan, and the trial court approved it in an order. Pursuant to the plan, R.J.F. was required to submit to drug testing and to attend substance abuse treatment. The plan provided that R.J.F. would have supervised visitation with her children.

During the pendency of the suit, T.O.M. remained in incarcerated for the offense of burglary of a habitation. He and R.J.F. were appointed counsel to represent them in the trial court.

The suit was tried to the bench in December 2013. As it had alleged in its petition, DFPS asserted that the parent-child relationship between R.J.F. and her son, K.C.F., and between R.J.F. and her three daughters, M.L.M., L.M.M., and A.G.M., should be terminated. More particularly, DFPS alleged that R.J.F. had "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children," in violation of Family Code subsection 161.001(1)(D), and had

5

"engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children," in violation of subsection 161.001(1)(E)."[2]

DFPS further asserted that R.J.F. had constructively abandoned the children in violation of Family Code subsection 161.001(l)(N).[3] DFPS also relied on R.J.F.'s alleged failure, in violation of subsection 161.001(l)(O), to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.[4]

In addition, DFPS asserted that the parent-child relationship between T.O.M. and his three daughters, M.L.M., L.M.M., and A.G.M., should be terminated. DFPS alleged that T.O.M. had violated Family Code subsections 161.001(1)(D) and 161.001(1)(E). DFPS further asserted that the termination of R.J.F.'s and T.O.M.'s parental rights would be in the best interest of the children.

At trial, DFPS called a number of witnesses to testify. The witnesses included: (1) R.J.F., (2) T.O.M., (3) R.J.F.'s mother, Donna, (4) the licensed chemical dependency counselor, Brad Austin, who has treated R.J.F. and T.O.M., (5) R.J.F.'s brother, Michael, (6) the court-appointed special advocate ("CASA")

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (Vernon 2014).

[3] *See id.* § 161.001(1)(N).

[4] *See id.* § 161.001(1)(O).

volunteers assigned to be the children's guardian ad litem and to supervise the children's visits with their parents; and (7) the DFPS caseworker, Gracelynn Carroll, assigned to the case.

The evidence at trial showed that R.J.F. suffers from unresolved drug addiction and dependency that has persisted for many years. R.J.F. admitted at trial that she had used cocaine, marihuana, and alcohol during the pendency of this suit. At the time of trial, R.J.F. testified that she would not pass a drug test because she had in the recent past smoked marihuana and drank alcohol. R.J.F. testified that she had not used drugs while the case was pending until September 2012, when T.O.M. was convicted of burglary and sent to prison. R.J.F. claimed that the stress of T.O.M. being sent to prison triggered her to start drinking and using cocaine.

The evidence showed that R.J.F. completed residential drug treatment programs for her addiction to crack cocaine and alcohol in 2007 and in 2013. R.J.F. indicated that the reason she had entered into treatment was to regain custody of her children. After each residential treatment, R.J.F. had relapsed and resumed her drug and alcohol use.

At the time of trial, R.J.F. did not have a home and was not employed. She was living with a friend. She stated that she had to quit her job at a nursing home because she has back injury. R.J.F. stated that she takes prescription hydrocodone

7

for her back pain. R.J.F. testified that she plans to apply for social security disability but had not started the process. R.J.F. also testified that she has suffered from depression since she was a teenager. She stated that Prozac helps her depression but that she is not able to afford it. R.J.F. acknowledged that she is more likely to use illegal drugs when she is not treated for her depression

The evidence showed that T.O.M. had suffered from addiction to crack cocaine in the past, during the time that the children were in T.O.M.'s and R.J.F.'s custody. The evidence also showed that T.O.M. and R.J.F. had used crack cocaine together. Evidence was presented showing that T.O.M. was aware his wife's drug addiction, though he believed that she was getting better. T.O.M. acknowledged that "perhaps once" he had suspected that R.J.F. had taken the children with her to obtain illegal drugs.

T.O.M. testified that he had not used drugs since 2010 and had successfully completed a drug treatment program. T.O.M. admitted, however, that his drug usage had led him to commit crimes, which resulted in his incarceration. He acknowledged that his incarceration had resulted in his children's placement in DFPS care.

At the time of trial, T.O.M. was serving a five-year prison sentence for burglary of a habitation, which he committed in 2010. The record also showed that, in 2005, T.O.M. committed the offenses of possession of a controlled

substance and forgery. He was sentenced to 11 months and to 18 months, respectively, in a state jail facility with the sentences to run concurrently. Evidence further showed that T.O.M. had multiple forgery convictions and another burglary conviction in 1990.

The evidence also demonstrated that R.J.F. and T.O.M. had difficulty maintaining a stable home for the children. Either due to a lack of employment or to T.O.M.'s incarceration, the evidence showed that the family frequently moved and had on a number of occasions moved in with R.J.F.'s mother, Donna.

The evidence showed that the children were happy and thriving in their current placements, the three girls with their aunt, Sherry, and K.C.F. with his grandmother, Donna, with whom K.C.F. had lived most of his life. Testimony was presented indicating that Sherry wanted to adopt the girls. Donna testified that she was receptive to adopting K.C.F., if that was what K.C.F. wanted.[5]

The trial court rendered judgment terminating the parent-child relationship between R.J.F. and her four children, K.C.F., M.L.M, L.M.M., and A.G.M. The court also terminated the parent-child relationship between T.O.M. and his three daughters, M.L.M, L.M.M., and A.G.M.

With respect to the termination of R.J.F.'s parental rights, the judgment recites that the trial court found, by clear and convincing evidence, that R.J.F. had

---

[5] The trial court also met in chambers with the children before making its ruling.

9

knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being,[6] engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being,[7] constructively abandoned the children,[8] and failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.[9]   With respect to the termination of T.O.M.'s parental rights, the judgment recites that the trial court found, by clear and convincing evidence, that he had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being[10] and had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being.[11] The judgment also recites that the trial court determined, by clear and convincing evidence, termination of the parent-child relationships was in the children's best

---

[6]     *See* TEX. FAM. CODE ANN. § 161.001(1)(D).

[7]     *See id.* § 161.001(1)(E).

[8]     *See id.* § 161.001(1)(N).

[9]     *See id.* § 161.001(1)(O).

[10]     *See id.* § 161.001(1)(D).

[11]     *See id.* § 161.001(1)(E).

interests.[12]  In addition, the trial court appointed DFPS as sole managing conservator of the children.

This appeal followed.  R.J.F. and T.O.M. each raise five issues, challenging the legal and factual sufficiency of the evidence to support termination of their parental rights.

## Sufficiency of the Evidence

### A.    Standard of Review

Termination of parental rights requires proof by clear and convincing evidence.  TEX. FAM. CODE ANN. § 161.001 (Vernon 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution.  *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *see also Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S. Ct. 1388, 1394–95 (1982) (recognizing fundamental liberty interest parent has in his or her child and concluding that state must provide parent with fundamentally fair procedures, including clear and convincing evidentiary standard, when seeking to terminate parental rights).  The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as

---

[12]      *See id.* § 161.001(2).

to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2014); *J.F.C.*, 96 S.W.3d at 264.

Section 161.001 of the Family Code provides the method by which a court may involuntarily terminate the parent-child relationship. *See* TEX. FAM. CODE. ANN. § 161.001. Under this section, a court may order the termination of the parent-child relationship if the court finds, by clear and convincing evidence, that (1) one or more of the acts enumerated in section 161.001(1) was committed and (2) termination is in the best interest of the child. *Id.* Although termination may not be based solely on the best interest of the child as determined by the trier of fact, *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights. *In re G.A.A.*, No. 01–12–01052–CV, 2013 WL 1790230, at *7 (Tex. App.—Houston [1st Dist.] Apr. 25, 2013, no pet.).

When determining legal sufficiency, we review all the evidence in the light most favorable to the finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96

S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at

13

266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We are mindful that the natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Id.* at 20–21; *see also In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012). However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

**B.      Termination of R.J.F.'s Rights under Subsection 161.001(1)(E)**

The termination of R.J.F.'s parental rights to her four children was predicated on, among others, a violation of Family Code subsection 161.001(1)(E). In her second issue, R.J.F. asserts that the evidence was legally and factually insufficient to support that predicate finding.

14

### 1.    *Applicable Legal Principles*

Subsection (E) of section 161.001(1) permits termination when clear and convincing evidence shows that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child.  TEX. FAM. CODE ANN. § 161.001(1)(E). Within the context of section 161.001(1)(E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment."  *Boyd*, 727 S.W.2d at 533.  Instead, "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health.  *Id.*; *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

It is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child relationship under subsection (E). *See M.C.*, 917 S.W.2d at 270.   However, termination under subsection 161.001(1)(E) requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required."  *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).  The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  "As a general rule, conduct that subjects a child to a life

15

of uncertainty and instability endangers the physical and emotional well-being of a child." *R.W.*, 129 S.W.3d at 739.

The statute does not require that conduct be directed at a child or cause actual harm; rather, it is sufficient if the parent's course of conduct endangers the well-being of the children. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Furthermore, the conduct does not have to occur in the presence of the child. *Id.* The conduct may occur before the child's birth and both before and after the child has been removed by DFPS. *Id.* A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

### 2. *Analysis*

In her brief, R.J.F. suggests that the trial court's determination that she committed the predicated act of subsection (E) endangerment was made without legally or factually sufficient proof. She asserts, "To believe the allegations which make her admission of narcotics use sufficient for termination would be to believe hearsay, conjecture and speculation made on the part of her family members, mainly her schizophrenic brother [Michael], who are frustrated with a family member struggling with addiction."

16

We disagree with R.J.F.'s characterization of the record. Contrary to her assertions, the evidence supports a finding that R.J.F. engaged in a course of conduct that endangered the physical or emotional well-being of her four children. R.J.F.'s testimony indicated that her illegal drug usage dates back to at least 2007, at which time her testimony indicates she had used crack cocaine a couple of times.

R.J.F. testified that, in 2007, CPS had been contacted, and as a result, her children were removed from her custody. She stated that, to have her children returned to her, she voluntarily entered into residential treatment for her drug addiction. R.J.F. admitted that she began drinking alcohol one year after her discharge from that program. She stated that she stayed "clean" from using crack cocaine for two years after her discharge but could not remember the specific years she had used cocaine after her discharge.

R.J.F. testified that she had not used drugs during the first part of the DFPS's investigation in this case; however, when T.O.M. was sent to prison in September 2012, she relapsed and drank alcohol and used cocaine. This resulted in a positive drug test for her. R.J.F. stated that, between T.O.M.'s incarceration in September 2012 and her re-admission to a residential drug treatment facility in February 2013, she used alcohol and cocaine. R.J.F. completed her stay in the drug-treatment facility in July 2013. However, according to her own testimony, R.J.F. was using drugs again by the time of trial in December 2013. When asked if

17

she would pass a drug test at that time, R.J.F. said that she would not because she had been smoking marihuana and drinking alcohol. She attributed her recent relapse to the fact that she had recently lost her job and her house and to the fact that she was not able to see her children. She admitted that she has had "several little relapses" of drug use "over the years."

R.J.F. also testified that she suffered from depression. R.J.F. stated that she was prescribed Prozac to treat her depression, but she could not afford it to buy it. K.C.F. acknowledged that she is more likely to use illegal drugs when she is not receiving treatment for her depression. Donna testified that R.J.F. had been receiving treatment for her depression through MHMRA but then stopped attending the treatment.

Brad Austin, a licensed chemical dependency counselor, who contracts with CPS and has worked with R.J.F. and T.O.M., also testified that R.J.F. is dependent on crack cocaine. R.J.F. was referred to Austin in approximately 2008 by CPS relating to allegations of substance abuse and neglect of her children. Austin stated that R.J.F. participated in group counseling in 2008 and was successfully discharged.

Austin further testified that R.J.F. was referred to him again in 2012 for an assessment. He determined that she needed individual counseling and random urinalysis testing. Austin stated that R.J.F. told him that she had been "clean since

18

2009" but had recently been taking hydrocodone, prescribed to her for back pain. Austin related that R.J.F. admitted to him that she was abusing the medication and "taking it wrong." Austin explained that hydrocodone is an opiate. He stated, "My concern was that she was just using her prescription medication to become intoxicated."

Austin explained that R.J.F. completed individual therapy with him in 2012 and was successfully discharged from treatment. However, when she came for another assessment on January 23, 2013, R.J.F. told Austin that she been smoking crack cocaine for the last three months due to stress and anxiety.

Austin stated that R.J.F. attended residential treatment at that point. According to Austin, R.J.F. contacted him around August 2013 to receive "aftercare" services following her discharge from residential treatment. R.J.F. showed up for four appointments but then failed to come. Austin testified that R.J.F. was unsuccessfully discharged due to her failure to come to her appointments.

Austin also stated that he was aware that R.J.F. suffered from depression. He averred that untreated depression can trigger drug abuse.

R.J.F.'s mother, Donna, testified that R.J.F. admitted to having a problem with crack cocaine. Donna stated that R.J.F. has had this problem for "several years now." Donna testified, "I just know that she has told me before that she

wants to stop and that she will—you know, she's told me that, 'I am not going to be doing this anymore.' And of course, there would always be another time."

The evidence showed that R.J.F., T.O.M., and the children had lived with Donna, intermittingly, over the years. Donna thought that R.J.F.'s and T.O.M.'s parental rights should be terminated because they could not provide a stable home for the children. She described how they would frequently lose their housing and would then come to live with her. Donna attributed this "erratic" lifestyle to T.O.M.'s and R.J.F.'s drug use.

Donna also testified that R.J.F.'s son, K.C.F., had told Donna about an incident that had upset him. The incident occurred while R.J.F. was driving. K.C.F. had been in the front seat with R.J.F., and the three girls were in the back seat. K.C.F. told Donna that, while R.J.F. was driving, K.C.F. saw R.J.F. "smoke something."

When asked whether she had ever seen R.J.F. under the influence of drugs, Donna stated that she did not know how people acted under the influence of drugs. In further response to this question, Donna stated that, R.J.F. would leave for one or two days and then return extremely tired and would sleep for most of the day. She also testified that R.J.F. would leave for several days at a time and then would "sleep a lot" when she returned home.

R.J.F.'s adult brother, Michael, also testified at trial. Michael testified that he lived with his mother, Donna, and K.C.F. He averred that R.J.F. has been using drugs since she was 18 years old. He stated that he has seen R.J.F. "shoot up coke," and she has told him that she is addicted to crack. Michael testified that he had seen R.J.F. under the influence of drugs "many times." He said that, after she would smoke crack cocaine, she "would sit there with her eyes bulged out. She would go from one couch to another to another, acting erratically."

Michael testified that during the last three to four years, when R.J.F. and the children lived with Donna, "[R.J.F.] would go and do drugs for three or four days, come back and pretty much sleep for three or four days." When asked how he reached the conclusion that R.J.F. was gone to "do drugs," Michael testified: "She told me it was for drugs."

To challenge the sufficiency of the evidence, R.J.F makes a number of assertions in her brief, which she claims undermines the subsection (E) endangerment finding. R.J.F. points out that she testified that she never used drugs in front of her children. However, a parent's actions or failures to act need not have been specifically directed at the child or have actually injured the child or even constituted a concrete threat of injury to the child to support an endangerment finding. *See Boyd*, 727 S.W.2d at 533. R.J.F.'s drug use need not have been conducted in her children's presence for it to have had a negative effect on her

21

parenting abilities. *See In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *11 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (affirming judgment terminating mother's parental rights under subsection (E) based on evidence of mother's drug use, even though mother claimed drugs not used in children's presence). Instead, "the statute is satisfied by showing that parental conduct simply jeopardized the child's physical or emotional well-being." *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied); *see also In re C.S.L.E.H.*, No. 02–10–00475–CV, 2011 WL 3795226, at *5 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (affirming termination under subsection (E) because "[f]ather's heroin and cocaine use after TDFPS removed the children is sufficient to constitute endangerment," even though no showing was made that children were neglected or abused because of drug use); *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (upholding termination of parental rights despite there being no direct evidence of parent's continued drug use actually injuring child); *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied) (recognizing that substance abuse "lends itself to an unstable home environment").

In addition, the evidence showed that, despite completing two residential treatment programs, R.J.F. continues to relapse and to use illegal drugs and alcohol. Significantly, R.J.F. admitted that she used illegal drugs during the

pendency of the DFPS's investigation and during the pendency of this case seeking to terminate her parental rights.

The Supreme Court of Texas has recognized that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re A.F.*, No. 13–09–00676–CV, 2010 WL 3180282, at *5 (Tex. App.—Corpus Christi Aug. 12, 2010, no pet.) (holding that mother's chronic illegal drug use supported subsection (E) endangerment finding); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."); *In re T.D.L.*, No. 02–05–00250–CV, 2006 WL 302126, at *7–8 (Tex. App.—Fort Worth, Feb. 9, 2006, no pet.) (mem. op.) (considering mother's continuous abuse of prescription drugs in analyzing trial court's subsection (E) finding); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct."). This Court has recognized that illegal drug use may support termination under subsection 161.001(1)(E) because "it exposes the child to the

23

possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. Courts have also held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being. *See, e.g., In re J.M.*, No. 12–11–00319–CV, 2013 WL 5657422, at *5 (Tex. App.—Tyler Oct. 16, 2013); *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); *In re S.K.A.*, 236 S.W.3d 875, 900–01 (Tex. App.—Texarkana 2007), pet. denied, 260 S.W.3d 463 (Tex. 2008); *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.).

R.J.F. further claims that no evidence was presented showing that she had a positive drug test. This is contrary to the record. Not only did R.J.F. acknowledge that she relapsed and used cocaine and drank alcohol in September 2012, while the termination case was pending, she also acknowledged that she had a positive drug test in October 2012.

In addition, R.J.F. points out that there was no evidence that she had ever been arrested for drug possession, and she cites her own testimony that her drug use over the years had only been sporadic. R.J.F. also assails the credibility of Michael's testimony, pointing out that Michael suffers from schizophrenia for which he takes medication. However, "[i]t is well established that, in a bench trial, the judge as the trier of fact weighs the evidence, assesses the credibility of

24

witnesses and resolves conflicts and inconsistencies." *In re D.D.D.K.*, No. 07–09–0101–CV, 2009 WL 4348760, at *6 (Tex. App.—Amarillo Dec. 1, 2009, no pet.) (mem. op.).

In sum, the evidence showed that R.J.F.'s chronic, reoccurring drug use endangered the children. Given the evidence, the trial court in this case could have reasonably inferred that R.J.F. has pursued a course of conduct, through her chronic drug use, that exposed her children to injury and placed them in jeopardy, i.e., endangered the children's physical and emotional well-being, even though no actual injury to the children was shown. The evidence also supported a conclusion of future danger to the children. R.J.F. continued to use drugs, despite having received treatment and being on the verge of having her parental rights terminated. R.J.F.'s testimony indicated that she relapsed to drug use when she was presented with a stressful situation, such as T.O.M.'s incarceration. The trial court could have further reasoned that R.J.F. will continue to pursue a course of conduct if the children were placed in R.J.F.'s care and that the children's physical and emotional welfare would be at risk, given R.J.F.'s past conduct. *See In re A.H.*, No. 02–06–00064–CV, 2006 WL 2773701, at *3 (Tex. App.—Fort Worth Sept. 28, 2006, no pet.) (mem. op.) (noting that stability and permanence are paramount in the upbringing of children, that an endangering environment can be created by a parent's involvement with an illegal drug, and that a factfinder may infer from past

conduct endangering the children's well-being that similar conduct will recur if the children are returned to the parent).

We conclude that the evidence, viewed in the light most favorable to a finding of endangerment, was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that R.J.F. engaged in conduct that endangered the children's physical or emotional welfare. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's endangerment determination or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that R.J.F. engaged in conduct that endangered the children's physical or emotional welfare. Accordingly, we hold that the evidence was legally and factually sufficient to support the subsection (E) endangerment finding with respect to the termination of R.J.F.'s parental rights to her four children. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

We overrule R.J.F.'s second issue.[13]

---

[13] Because there is sufficient evidence of subsection (E) endangerment, we need not address R.J.F.'s first, third, and fourth issues, challenging the sufficiency of the evidence to support the trial court's findings that R.J.F. committed the predicate acts listed in subsections 161.001(1)(D), (N), and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

**C. Termination of T.O.M.'s Rights under Subsection 161.001(1)(D)**

The termination of T.O.M.'s parental rights to his three daughters was supported in the judgment by a predicate finding that T.O.M. had violated Family Code subsection 161.001(1)(D). In his first and second issues, T.O.M. asserts that the evidence was legally and factually insufficient to support that predicate finding.

*1. Applicable Legal Principles*

Subsection 161.001(1)(D) permits termination when clear and convincing evidence shows that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D). Subsection (D) requires a showing that the environment in which the child was placed posed a danger to the child's physical or emotional health, and it permits termination based on a single act or omission by the parent. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *In re L.C.*, 145 S.W.3d 790, 795–96 (Tex. App.—Texarkana 2004, no pet.).

Subsection (D) concerns the child's living environment, rather than the parent's conduct, though parental conduct may be relevant to the child's environment. *See In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). The parent need not have certain knowledge that an actual injury is occurring, but must at least be aware of the potential for danger to the child in such

27

an environment and must have disregarded that risk. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). "The relevant time frame for establishing that the parent 'knowingly . . . allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child' under Section 161.001(1)(D) is prior to the child's removal since conditions or surroundings cannot endanger a child unless that child is exposed to them." *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting TEX. FAM. CODE ANN. § 161.001(1)(D)); *accord In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.).

Endangerment can be exhibited by both actions and failures to act. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). In addition, it is not necessary that a parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment creates a potential for danger which the parent is aware of, but disregards. *Id.*

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Thus, although the focus of subsection (D) is on the child's living environment and not on the parent's

28

conduct, parental conduct may produce an endangering environment. *See Jordan*, 325 S.W.3d at 721; *In re D.T.*, 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). For example, abusive or violent conduct by a parent or other resident of the child's home, as well as illegal drug use and criminal activity, support a conclusion that the child's surroundings endanger his physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

### 2.    *Analysis*

Applying the two principles that drug abuse in a child's home can be a course of endangering conduct and that a parent bears the responsibility to guard against potential dangers in the child's environment, Texas courts have consistently found that a parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions outlined in subsection (D). *See, e.g., In re J.J.*, No. 07–13–00117–CV, 2013 WL 4711542, at *4 (Tex. App.— Amarillo Aug. 29, 2013, no pet.) (citing father's knowledge of mother's drug use as a basis to support termination of father's parental rights for endangerment under subsection (D); *In re Z.C.J.L.*, Nos. 14–13–00115–CV, 14–13–00147–CV, 2013 WL 3477569, at *13 (Tex. App.—Houston [14th Dist.] July 9, 2013, no pet.) (mem. op.) (upholding termination of father's parental rights under subsection (D) because evidence showed that he was aware of mother's drug use); *In re M.C.*, 352 S.W.3d 563, 568 (Tex. App.—Dallas 2011, no pet.) (holding father's knowledge of

mother's drug use and failure to take any action to remove the children from mother's home was sufficient to support finding under subsection (D)); *In re M.M.*, No. 02–08–00275–CV, 2009 WL 2196129, at *8 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.) (concluding evidence was sufficient to support findings under subsections (D) and (E) when it showed, among other things, that father knew of mother's drug use); *In re A.O.*, No. 02–09–00005–CV, 2009 WL 1815780, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (mem. op.) (holding evidence sufficient to support endangerment findings when father knew mother was using drugs but did not take steps to protect daughter from endangering environment).

Here, we have already concluded that the evidence was legally and factually sufficient to support a conclusion that R.J.F.'s course of conduct through her drug use endangered the children under subsection 161.001(1)(E). The evidence also demonstrated that T.O.M. was aware of R.J.F.'s illegal drug use. T.O.M., who at the time of trial had been married to R.J.F. for 11 years, testified that he knew R.J.F. had a problem with drugs, though he believed that she was "progressing and getting better." T.O.M. admitted that he and R.J.F. had used crack cocaine at a time when they still had custody of the children.

We conclude that the evidence, viewed in the light most favorable to a finding of endangerment, was sufficiently clear and convincing that a reasonable

factfinder could have formed a firm belief or conviction that T.O.M. knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's endangerment determination or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that T.O.M. knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. Accordingly, we hold that the evidence was legally and factually sufficient to support the subsection (D) endangerment finding with respect to the termination of T.O.M.'s parental rights to his three daughters. *See* TEX. FAM. CODE ANN. § 161.001(1)(D).

We overrule T.O.M.'s first and second issues.[14]

## D.     The Children's Best Interest

By their fifth issues, both R.J.F. and T.O.M. challenge the legal and sufficiency of the evidence to support the trial court's finding that termination of each of their parental rights was in the children's best interest.

---

[14]     Because there is sufficient evidence of subsection (D) endangerment, we need not address T.O.M.'s third and fourth issues, challenging the sufficiency of the evidence to support the trial court's findings that he committed the predicate act listed in subsection 161.001(1)(E). *See In re A.V.*, 113 S.W.3d at 362.

### 1. *Applicable Legal Principles*

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2014). Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of harm to the child; whether there is a history of substance abuse by the child's family or others that have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with minimally adequate health and nutritional care, guidance and supervision, and a safe physical home environment; and whether an adequate social support system consisting of an

extended family and friends is available to the child.  *Id.* § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

The Supreme Court of Texas has set out some additional factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child.  *C.H.*, 89 S.W.3d at 27.  While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *See In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the child warrants termination of the parent-child relationship. *C.H.*, 89 S.W.3d at 28; *H.D.*, 2013 WL 1928799, at *13. Furthermore, the best interest analysis may consider, not only direct evidence, but also circumstantial evidence, subjective factors, and the totality of the evidence. *See H.D.*, 2013 WL 1928799, at *13.

### 2. *Best Interest with Respect to Termination of R.J.F.'s Rights*

Multiple factors support the trial court's determination that termination of R.J.F.'s parental rights was in the children's best interest. The trial court heard testimony that K.C.F. wanted to remain living with his grandmother, Donna, where he had lived the majority of his life. Jodi Shultz, the CASA supervisor assigned to the case, testified that M.L.M. asked her: "[W]hat happens if Mom—if we have to go back to Mom and she gets sick again or uses drugs again"? Shultz stated that M.L.M. "is already anticipating that this is going to happen." She testified that K.C.F. "is already worrying . . . that this could happen."

Evidence relating to R.J.F.'s drug use supported the trial court best interest finding under the following factors: the children's emotional and physical needs now and in the future; emotional and physical danger to the children now and in the future; acts or omissions indicating that the existing parent-child relationship is not a proper one; and excuses by R.J.F. for her relapsing and drug use. *See Holley*,

34

544 S.W.2d at 371–72 (factors two, three, eight, and nine). We have already concluded that the evidence was sufficient to show that R.J.F.'s behavior of her chronic, reoccurring drug use endangered the children.

R.J.F. testified that she believed that she would get better by attending narcotics anonymous meetings. However, the evidence showed that R.J.F. had ceased her treatment with drug counselor, Brad Austin, despite availability of the services. The evidence also showed that R.J.F. had relapsed in the past despite having attended residential treatment. In sum, the evidence supported an inference that R.J.F.'s pattern of drug use would continue as it had for the last several years. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing that, in determining best interest, courts may consider magnitude, frequency, and circumstances of harm to child; whether there is history of substance abuse; parent's willingness to seek out and complete counseling services and cooperate with appropriate agency; and willingness and ability of child's family to effect positive environmental and personal changes within a reasonable period of time).

The lack of stability in R.J.F.'s home also supports termination. *See Holley*, 544 S.W.2d at 371–72 (factor seven). The evidence showed that, when the children were in R.J.F.'s and T.O.M.'s custody, housing instability was an issue. The family would move often because they would not be able to pay their rent. The evidence indicated that the family would frequently move in with Donna and

35

then move out again. Donna testified that she believed that the R.J.F.'s and T.O.M.'s "erratic" lifestyle was caused by their drug use.

At the time of trial, the evidence showed that R.J.F. was living with a friend. She stated that she did not have a home of her own and was unemployed. R.J.F. explained that she was no longer physically able to work because of back injury. She stated that she planned to apply for Social Security benefits but had not started that process. R.J.F. acknowledged that she was not in a position to care for her children at the time of trial, but asked stated, "I want more time to be able to get my Social Security, for [T.O.M.] to get out [of prison], for us to find—get a suitable home for our children." R.J.F. stated that she wants her daughters to live with her and T.O.M. but does not plan to remove K.C.F. from Donna's home, where he has spent the majority of his life. *See id.* (factor six: plans for the child).

With respect to the stability of the children's current placements and DFPS's plans for the children, the evidence supported termination. *See id.* (factors six and seven). As stated, the three girls are currently placed with their paternal aunt, Sherry. The evidence showed that the girls love their aunt and are bonded with her. The girls are happy in Sherry's home and are doing well in school. The evidence also showed that Sherry wants to adopt the girls.

Similarly, K.C.F. is happy and doing well in Donna's home. Donna testified that she would consider adopting K.C.F. if that is what he wanted.

36

In her brief, R.J.F. relies on evidence, relevant to the emotional and physical needs of the children now and in the future and to the R.J.F.'s parenting abilities, which she asserts weighs against termination. *See id.* (factors two and four). As R.J.F. points out, it is undisputed that all four children love her and T.O.M. It was not in dispute that the children did well in school while in their custody. The evidence also showed that the children were involved in activities and that the family would spend time together. In addition, evidence was presented that R.J.F. and T.O.M. had gotten medical care for the children and for themselves.

However, evidence was also presented weighing against R.J.F.'s parenting abilities. Donna and Michael testified that R.J.F. would disappear for several days at a time leaving the children in their care. When she would return home, R.J.F. would then sleep for prolonged periods of time. Michael testified that R.J.F. had told him that, when she was gone for several days, she was using drugs.

In addition, the record presents conflicting evidence regarding whether R.J.F. complied with the visitation requirements after the children were removed from her care. R.J.F. testified that DFPS did not facilitate the visits as it had agreed. The evidence shows that R.J.F. saw her children during this time, but the visits were sporadic.

In addition, Gracelynn Carroll, the DFPS caseworker assigned to the case, testified that R.J.F. had exhibited "disruptive" and "aggressive" behaviors when

R.J.F. had gone to the Donna's and Sherry's homes to see the children. R.J.F.'s aggressive behavior resulted in the trial court's signing of a protective order, prohibiting R.J.F. from visiting the children, unless supervised by DFPS.

R.J.F. correctly points out that some evidence exists in the record weighing against the trial court's finding that termination was in the children's best interest. However, evidence cannot be read in isolation; it must be read in the context of the entire record. The record reveals that R.J.F. has continued to relapse and use drugs, a pattern she has exhibited over many years. As the factfinder, the trial court, after assessing the credibility of the witnesses and weighing the evidence, could have reasonably inferred that R.J.F. would continue her pattern and practice of drug use. Such an inference relates directly to R.J.F.'s ability to provide a stable and suitable home for her children and indicates that her children's physical and emotional well-being may be endangered in the future.

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable fact finder could have formed a firm belief or conviction that termination of the parent-child relationship between R.J.F. and her children was in the children's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent-child relationship

38

between R.J.F. and the children was in the children's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. Thus, we hold that the evidence was legally and factually sufficient to support the best-interest finding.

We overrule R.J.F.'s fifth issue.

### 3. Best Interest with Respect to Termination of T.O.M.'s Rights

The evidence supporting the trial court's finding that T.O.M. had knowingly allowed his three daughters to remain in conditions or surroundings which endangered their physical or emotional well-being for termination also supports the finding that termination of the parent-child relationship between T.O.M. and his three daughters is in their best interest. *See C.H.*, 89 S.W.3d at 28; *H.D.*, 2013 WL 1928799, at *13. Specifically, such evidence is relevant to the following factors: the girls' emotional and physical needs now and in the future; emotional and physical danger to the children now and in the future; T.O.M.'s acts or omissions indicating that the existing parent-child relationship is not a proper one; and T.O.M.'s excuses for permitting the girls to remain in R.J.F.'s care despite the fact T.O.M. knew she was a drug addict. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, eight, and nine).

In addition, the evidence showed that T.O.M. has a history of drug use and addiction. T.O.M. testified that he completed a 42-day residential drug treatment program in 2008. The evidence indicates that T.O.M. relapsed and began using drugs again. He admitted that he and R.J.F. had smoked crack cocaine together, and he acknowledged that his drug use had led him to commit criminal offenses. *See* TEX. FAM. CODE ANN. § 263.307(b) (providing that courts can consider whether there is a history of substance abuse by the child's family or others who have access to the child's home in making best interest finding).

With respect to his criminal record, the evidence showed that T.O.M. committed a number of offenses in 1990, including forgery and burglary. T.O.M. testified that he spent 18 months in state jail for committing the offenses of forgery and possession of controlled substances in 2005. T.O.M. stated that he completed parenting classes while serving that jail sentence. The record further shows that, despite his 18 months in jail and the completion of a residential drug program in 2008, T.O.M. re-offended on December 1, 2010, by committing the felony offense of burglary of a habitation. T.O.M. was convicted of that offense in September 2012. He was sentenced to five years in prison. T.O.M. was still incarcerated at the time of trial. T.O.M. testified that he expected to be paroled in July 2014, but offered no other proof of this. After his release, he stated that he will be on parole. He plans to live initially with his sister, Christina, and then to move into a halfway

40

house for an unspecified amount of time. He acknowledged that he could not presently care for his daughters, but asked the trial court to give him "a chance." *See id.* (stating courts may consider the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time).

We agree with T.O.M. that termination of his parental rights cannot be based solely on his incarceration in this case. As we have previously acknowledged, the termination of parental rights should not be used as punishment in addition to imprisonment for the commission of criminal offenses. *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). However, a parent's criminal history is a factor in determining a child's best interest, although it is not dispositive. *See id.* "[I]n determining the weight of this factor [criminal history], we consider the expected length of [the parent's] imprisonment and whether it can be inferred from [his] criminal conduct that he has endangered the safety" of the child. *Id.*

As stated, T.O.M. served 18 months in state jail, starting in 2005. He is currently serving a five-year sentence that he began in September 2012. T.O.M. expects to be released on parole in July 2014. He testified that he will ultimately reside in a halfway house for an unspecified period of time.

Additionally, T.O.M. has admitted his drug use led to his commission of the criminal offenses. In other words, his criminal conduct was interconnected with his drug use. As we have discussed, a parent's illegal drug use can constitute endangering conduct. Thus, while by no means dispositive, T.O.M.'s criminal history and current incarceration in this case is probative of the children's best interest.

Evidence T.O.M.'s past drug use, criminal history, and current incarceration also demonstrate that T.O.M. has not been able to provide a stable home for his daughters in the past. *See id.* (factor seven). Evidence was offered that T.O.M. has been employed performing construction work in the past and has job skills. But the evidence also indicated that T.O.M. could not maintain employment, and the family would often lose their housing. The evidence showed that T.O.M. currently is not able to provide a stable home due to his incarceration, and no evidence was offered regarding when he would be able to provide stability for his daughters. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14–12–00850–CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.).

In contrast, the evidence demonstrated that the girls are currently placed in a stable, nurturing home with their paternal aunt. The girls love their Aunt Sherry

and are doing well and are happy. The evidence showed that Sherry wants to adopt the girls.

As T.O.M. points out, evidence was presented weighing against the best-interest finding. It is undisputed that the girls love their father. And it is undisputed that, when they were in T.O.M.'s and R.J.F.'s custody, they did well in school and were involved in extracurricular activities. T.O.M. testified that he would help the girls with their homework. T.O.M. also testified that the family would spend time together doing such activities as fishing, swimming, and camping.

The DFPS caseworker testified that she observed T.O.M. interacting appropriately with his daughters during a visit, and the girls seemed happy to see him. T.O.M. offered into evidence cards and letters that his daughters had sent to him, stating how much they loved and missed him.

T.O.M. also testified that he has not used illegal drugs since 2010. He stated that, after he committed the most recent burglary offense in 2010, he was in jail for 99 days. He was then released on a personal recognizance bond. T.O.M. testified that he voluntarily went into a residential drug treatment for seven months.

T.O.M. further testified that, after his discharge from the drug treatment program, he found steady work until he was re-incarcerated in September 2012. T.O.M. pointed out that he never failed a drug test while under investigation by

43

DFPS in this case. In addition, T.O.M. testified that, while in prison, he has taken classes, including a welding class. T.O.M. stated that, once out of prison, he plans to start over.

When asked how he knew that he would not repeat his past behaviors, T.O.M. responded that it was because of his newly found religious convictions. T.O.M. testified that even though R.J.F. is his wife and his "best friend," he will protect his children from her and not permit them to be around her if she is doing drugs.

While the evidence demonstrated that T.O.M. has made progress with respect to his own drug addiction, such evidence does not necessarily negate a determination that T.O.M. will fail to protect his daughters from being endangered by their exposure to R.J.F., who, at the time of trial, was still abusing drugs. Although T.O.M. testified that he would not allow R.J.F. to have access to the children if she were using illegal drugs, the evidence showed that, even after T.O.M. completed a seven-month residential drug treatment program, the children remained in R.J.F.'s care until they were removed by DFPS in December 2012. In other words, although T.O.M. completed drug treatment and claimed to be drug-free, he nonetheless allowed his daughters to remain in conditions or surroundings which endangered their physical or emotional well-being. Given the evidence, the trial court, as the fact finder, was free to disregard T.O.M.'s claim that he would

44

adequately safeguard his children from being exposed to such endangering conditions in the future.

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable fact finder could have formed a firm belief or conviction that termination of the parent-child relationship between T.O.M. and his daughters was in the children's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent-child relationship between T.O.M. and his daughters was in their best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. Thus, we hold that the evidence was legally and factually sufficient to support the best-interest finding with respect to T.O.M.

We overrule T.O.M.'s fifth issue.

**Conclusion**

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.